## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

_____

)
1900 MARKET LLC and                          )
ANODYNE HS GROUP, LLC,                        )
                                             )
     Plaintiffs,                            )
                                             )
v.                                           )    Case No. _____
                                             )
BLACKFYRE USA, INC.                          )
                                             )
     Defendant.                             )
_____)

## COMPLAINT

Plaintiffs 1900 Market LLC ("**1900 Market**") and AnodyneHS Group LLC ("**Anodyne**" and together, "**Plaintiffs**"), by and through their undersigned attorneys, file this Complaint against Defendant Blackfyre USA Inc. ("**Blackfyre USA**" or "**Defendant**") as follows:

### I.    NATURE OF THE ACTION

1.    This is an action for rescission of transactions based on the parties' mutual mistake of fact and related claims relating to the transfer of equity in non-party AMI Expeditionary Healthcare (USA) LLC ("**AMI USA**").

2.    Plaintiffs and Blackfyre USA collectively own AMI USA.

3.    Plaintiffs and non-party Blackfyre S.A. collectively own non-party AMI Expeditionary Healthcare LLC ("**AMI Ex**").

4.    Upon information and belief, non-party Andrew Walker ("**Walker**") owns 100% of Blackfyre SA, which owns 100% of Blackfyre USA.

5.    Although the parties agreed that any purchase by Blackfyre SA and Walker of equity in AMI Ex from Plaintiffs would be at the earliest on January 1, <u>2029</u> to allow AMI Ex to

build its business, the original agreements between the parties contained typographical errors stating the purchase could occur "on or before January 1, <u>2019</u>".

6.     After executing the original agreements, the parties realized the error. Indeed, Walker and Blackfyre SA admitted and apologized for the error in writing and the parties jointly revised the agreements. Walker and Blackfyre SA later admitted multiple times that the purchase could occur at the earliest in 2029.

7.     Nevertheless, starting in 2020, Plaintiffs transferred the equity in AMI Ex to Walker and Blackfyre SA because the parties mistakenly believed that the relevant documents indicated the transactions could occur in 2019.

8.     In or around 2020, Walker assigned any equity he owned in AMI Ex to his company, Blackfyre SA.

9.     Thereafter, the parties established AMI USA using the same mistaken equity percentages as AMI Ex.

10.     Plaintiffs did not realize the error until recently when they began reviewing AMI Ex and AMI USA corporate documents and agreements in connection with another matter.

11.     In addition, 1900 Market did not realize that Blackfyre SA failed to pay all amounts due under the relevant agreement in exchange for the transfer of equity.

12.     Plaintiffs now file this suit for rescission of the transactions, disgorgement of any amounts Defendant received because of the transactions executed as a result of the parties' mutual mistake of fact, and related claims.

## II.   RELEVANT PARTIES

13.     1900 Market is a limited liability company organized under the laws of the State of Wyoming with a principal place of business at 300 Conshohocken State Road, Suite 570, West Conshohocken, Pennsylvania.

14.     Anodyne is a limited liability company organized under the laws of the State of Wyoming with a principal place of business at 810 H North Kalaheo Ave., Kailua, Hawaii.

15.     Blackfyre USA is a Delaware corporation with a principal place of business in New Jersey.  Blackfyre USA is a fully owned subsidiary of Blackfyre SA and Walker is Blackfyre USA's Chief Executive Officer.

16.     Non-party AMI USA is a limited liability company organized under the laws of Wyoming with a principal place of business at 12030 Sunrise Valley Drive, Suite 250, Reston, Virginia.  AMI USA provides medical services in complex operating environments, primarily in the United States. 1900 Market, Anodyne and Blackfyre USA are AMI USA's current members.

17.     Non-party Blackfyre SA is a company organized and existing under the laws of Panama with a principal place of business, upon information and belief, at MMG Tower, Piso 16, Calle 53E, Urb Marbella, Republic of Panama.  Walker is Blackfyre SA's sole shareholder and Chief Executive Officer.

18.     Upon information and belief, non-party Walker is an individual and citizen of the United Kingdom, Vanuatu and Australia and is domiciled in Kuala Lumpur, Malaysia at 3 Jalan Pinang, KLCC, Kuala Lumpur, Malaysia.  Walker is the Chairman and Chief Executive Officer of AMI Ex and on the Board of Directors of AMI USA.

19.     Non-party AMI Ex is a Delaware limited liability company with a principal place of business at 12030 Sunrise Valley Drive, Suite 250, Reston, Virginia.  AMI Ex provides medical

services to international aid organizations, humanitarian concerns, the private sector and government agencies in a wide range of remote and challenging environments. AMI Ex's services range from health consultancies and deployment of single-person aid posts and mobile clinics through to full-field hospitals and global aeromedical evacuation solutions. AMI Ex can provide people, facilities, equipment, consumables, pharmacy products, procedures, training, or any combination of these services depending upon the customer's needs, requirements and desired healthcare outcomes. 1900 Market, Anodyne and Blackfyre SA are AMI Ex's current members.

20.     Non-party Aspen Medical Pty Ltd. ("**Aspen Medical**") was at all relevant times, upon information and belief, an Australian corporation, beneficially owned 50% by Walker and 50% by Glenn Keys, an individual who, upon information and belief, is a citizen of Australia.

21.     Non-party G&A Keys Family Trust (the "**Trust**") is a trust settled, upon information and belief, in Australia. Upon information and belief, the trustee of the Trust is Amelda Keys, who is domiciled in Australia. Upon information and belief, Glenn Keys and his family are beneficiaries of the Trust.

22.     Non-party 13 Pisces LLC ("**13 Pisces**") was a limited liability company that, upon information and belief, was organized under the laws of the State of Wyoming with a principal place of business in the United States of America.

### III.     JURISDICTION AND VENUE

23.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

24.     This Court has personal jurisdiction over Blackfyre USA because Blackfyre USA is domiciled in Delaware.

25.     Venue is appropriate in this Court pursuant to 28 USC § 1391 because Defendant is subject to the Court's personal jurisdiction in this district.

## IV.    FACTUAL BACKGROUND

**A.    The Parties Establish AMI Ex With The Goal Of Obtaining United States Government Contracts.**

26.     In or around January 14, 2010, 1900 Market, Anodyne, 13 Pisces and Aspen Medical established AMI Ex.

27.     At that time, the members of AMI Ex owned the following percentages: 1900 Market owned 17%, Anodyne owned 17%, 13 Pisces owned 17% and Aspen Medical Pty owned 49%.

28.     The parties agreed to this ownership structure, in part, to allow AMI Ex to bid for and win certain United States government contracts in connection with their work.

29.     To be eligible and awarded certain contracts from the United States government, departmental regulations require that 51% of a company be owned and controlled by United States citizens.

30.     Upon information and belief, 1900 Market, Anodyne and 13 Pisces are United States citizens while Aspen Medical is not.

**B.    The Parties Agree To Execute Membership Interest Purchase Agreements With A Completion Date of January 1, 2029.**

31.     In or around December 31, 2016, 13 Pisces decided to cease being a member of AMI Ex and to sell all its interest of approximately 17% in the company.

32.     The remaining members of AMI Ex decided to split 13 Pisces' interest evenly, with each member to receive 4.25%.

33.     At the time, however, AMI Ex was still a relatively new company and attempting to build its business.

34.     To continue to be eligible for certain United States government contracts and to build AMI Ex's business through at least 2029, the parties agreed to allow 1900 Market and Anodyne to continue to own at least 51% of AMI Ex.

35.     As a result, the parties agreed that 1900 Market and Anodyne would each purchase 8.5% membership interest in AMI Ex from 13 Pisces.

36.     The parties agreed, however, that on January 1, 2029, Aspen Medical's owners, Walker and Glenn Keys (through the Trust), would have the option to purchase 4.25% membership interest in AMI Ex from Anodyne and 1900 Market, respectively.

37.     The parties agreed that allowing AMI Ex to have 51% ownership by United States citizens until at least 2029 would set AMI Ex up for success and allow it to build its business with certain parts of the United States government.

38.     As a result, the parties drafted Membership Interest Purchase Agreements ("**MIPAs**") to embody their agreement.

**1.      <u>The parties initially execute MIPAs with typographical errors that did not embody the parties' agreement.</u>**

39.     The parties decided to draft MIPAs between Walker and Anodyne and between the Trust and 1900 Market.

40.     On or about April 9, 2017, Anodyne and Walker executed a Membership Interest Purchase Agreement ("**Anodyne Mistaken MIPA**").

41.     On or about April 9, 2017, 1900 Market and the Trust also executed a Membership Interest Purchase Agreement ("**1900 Market Mistaken MIPA**" and together with the Anodyne Mistaken MIPA, the "**Mistaken MIPAs**").

42.     The Mistaken MIPAs had identical language other than the names of the parties.  A true and correct copy of the 1900 Market Mistaken MIPA is attached as **Exhibit 1**.

43.     At Section 5.1, the Mistaken MIPAs incorrectly indicated the "Completion Date" on which the 4.25% interest in AMI Ex would be transferred to Walker and the Trust, respectively, provided the proscribed steps were completed.

44.     Instead of indicating that the Completion Date was on January 1, 2029, the Mistaken MIPAs provided that the Completion Date was "on or before" January 1, 2019.

45.     Specifically, Section 5.1 of the Mistaken MIPAs said:

> Completion is to occur **on or before 1 January 2019** with payment of the final tranche ("Final Installment") of monies as set out in Schedule 1 (the "Completion Date") once funds are transferred, or at any other time or place agreed in writing by the parties.

(emphasis added).

46.     In addition, although Schedule 1 to the Mistaken MIPAs indicated that the final payment was to be made in 2029, it included that the transaction should occur "on or before" January 1, 2029 rather than "on or about" that date.

47.     In particular, Schedule 1 of the Mistaken MIPAs stated the $75,000 payment was to be made in the following five installments: (1) Initial installment of $50,000; (2) $5,000 on or before December 2017; (3) $5,000 on or before July 2018; (4) $5,000 on or before December 2018; and (5) **$10,000 on or before January 1, 2029**.

48.     Thus, the Completion Date in the Mistaken MIPAs had typographical errors because it listed the Completion Date as "on or before 1 January 2019" rather than "on or about 1 January 2029".

49.    In addition, Schedule 1 of the Mistaken MIPAs had a typographical error because it provided that the final payment could be made "on or before" January 1, 2029 rather than "on or about" January 1, 2029.

50.    Section 16.4 of the Mistaken MIPAs also stated that "[t]he terms and conditions contained herein shall extend to the benefit of and be binding upon the respective heirs, personal representatives, successors and permitted assigns of the parties hereto."

51.    Section 16.7 of the Mistaken MIPAs further stated that "[a]ny action brought to enforce any provision of this Agreement or which arises under this Agreement shall be brought in any court of competent jurisdiction in the State of Virginia."

**2.    The parties realize the typographical errors in the Mistaken MIPAs and revise them to reflect the parties' agreement.**

52.    On April 12, 2017, after executing the Mistaken MIPAs, Anodyne's principal, Thomas Crabtree ("**Crabtree**"), wrote Walker an email seeking clarification on the wording of the Mistaken MIPAs.

53.    Crabtree sought clarification of Anodyne and 1900 Market's position with respect to the references of 2019 and 2029 in the Mistaken MIPAs.  Specifically, Crabtree wrote:

> [O]ur attorneys asked for additional clarification re our … position come 2019 and 2029.  We explained it as we've discussed but they said it would be far better to spell things out more clearly and to reference and clarify the meaning of terms – closure and completion – in this document.  They also highlight 2.3 where it seems at the initial closing date (2019) the buyer has his percentage to exercise as he sees fit and therefore there is not a 51% USG ownership for US contracting purposes.  I think it all boils down to just clarifying what exactly happens in 2019, the status of the agreement from 2019-2029 and exactly what happens in 2029.

54.    A true and correct copy of Crabtree's email, dated April 12, 2017, is attached as **Exhibit 2**.

55.     Thus, Crabtree highlighted that pursuant to the Mistaken MIPAs and contrary to the parties' agreement, in 2019, AMI Ex would not have 51% ownership by United States citizens.

56.     After reviewing Crabtree's email, Walker realized the Mistaken MIPAs included errors.  As a result, Walker wrote Crabtree the following email in response:

Hi Mate

**<u>Really really sorry – there is a typo in 5.1 where is (sic) says 2019- should read 2029. I must have read this ten times! Needs changing</u>**

Also, putting a definition on the Closing Date would only help.

Best regards

Andrew

(emphasis added).  A true and correct copy of the email from Walker to Crabtree is attached as **<u>Exhibit 2.</u>**

57.     Thereafter, the parties exchanged drafts of a revised MIPA that corrected the typographical errors in the Mistaken MIPAs.

58.     On April 25, 2017, the parties circulated a redline of the Mistaken MIPAs that defined "Closing Date, "Completion Date" and "Effective Date" and revised Section 5.1 to state that Completion and payment were to occur <u>on or about January 1, 2029</u>.

59.     The parties agreed that the revised version of the Mistaken MIPAs embodied the parties' original agreement on this issue.

60.     As a result, on or about April 27, 2017, 1900 Market and the Trust executed the corrected version of the Membership Interest Purchase Agreement ("**1900 Market Corrected MIPA**").

61.     At or around the same time, Anodyne executed the corrected version of the Membership Interest Purchase Agreement ("**Anodyne Corrected MIPA**" and with the 1900 Market Corrected MIPA, the "**Corrected MIPAs**") and emailed it to the Trust, Walker and 1900 Market.

62.     Upon information and belief, Walker executed the Anodyne Corrected MIPA.

63.     The 1900 Market Corrected MIPA and the Anodyne Corrected MIPA contained all of the same terms except the parties' names.  A true and correct copy of the 1900 Market Corrected MIPA is attached as **Exhibit 3**.

64.     The Corrected MIPAs incorporated all the redlined changes exchanged between the parties on April 25, 2017.

65.     Specifically, the Corrected MIPAs defined "Completion Date" as "the date by which this Agreement is effective and all instalments of the Purchase Price have been received by the Seller".

66.     "Seller" was defined in each of the Corrected MIPAs as Anodyne and 1900 Market, respectively.

67.     Section 2.2 of the Corrected MIPAs set forth the payment terms of the exchange and provided that if any of the payments are not made as specified in Schedule 1 of the Corrected MIPAs, the Corrected MIPAs shall be "null and void and of no future effect."

68.     Specifically, Section 2.2 states:

In consideration of and in exchange for the Sale of the Membership Interest, Buyer agrees to pay Seller the Purchase Price.  The Purchase Price shall be paid to Seller in installments, consisting of an initial installment ("Initial Installment") which must be received by Seller no later than the 1st December 2017, and subsequent installments as specified in Schedule 1 ("Subsequent Installments"), failing any of which, including the Initial Installment, **this Agreement shall be null and void and of no future effect.**

(emphasis added).

69.     Most importantly, the Corrected MIPAs provided that "Completion" was to occur on January 1, 2029 with the receipt of the final installment as set forth on Schedule 1.

70.     In particular, Section 5.1 states:

Completion is to occur **on or about 1 January 2029** with receipt by the Seller of the final installment ("Final Installment") of the Purchase Price as set forth in Schedule 1[.]

(emphasis added).

71.     Schedule 1 of the Corrected MIPAs provided that the Purchase Price shall be $75,000 paid in four installments, as follows: (a) Initial installment of $25,000; (b) $25,000 on or before July 2018; (c) $24,000 on or before December 2018; and (d) **$1,000 on or about January 1, 2029**.

(emphasis added).

72.     The Corrected MIPAs also provided at Section 16.5 that "[t]he terms and conditions contained herein shall extend to the benefit of and be binding upon the respective heirs, personal representatives, successors and permitted assigns of the parties hereto."

73.     In addition, the Corrected MIPAs provided at Section 16.7 that the parties agreed to litigate any issues regarding the Corrected MIPAs in Virginia:

The validity of this Agreement and of any and all terms and provisions thereof, as well as the rights and duties of the parties to this Agreement, shall be interpreted, construed and enforced pursuant to and in accordance with the laws of the State of Virginia. Any action brought to enforce any provision of this Agreement or which arises under this Agreement shall be brought in any court of competent jurisdiction in the State of Virginia.

**C.    Walker And Blackfyre SA Confirm The Completion Date Of The MIPAs Is January 1, 2029.**

74.    Walker and Blackfyre SA admitted multiple times that the "Completion Date" of the MIPAs was January 1, 2029.

75.    For example, on November 6, 2018, Walker confirmed that Section 5.1 of the Corrected MIPA stated that the "Completion Date" was January 1, 2029 by quoting the relevant language in a communication to Plaintiffs.

76.    Specifically, on November 6, 2018, Walker sent Crabtree a letter stating:

Dear Tom

RE: Completion of Sale of AMI Shares

Payment of the Final Instalment and Completion of the share parcel transfer as contained in the Membership Interest Purchase Agreement (MIPA), dated 9th April 2017, was anticipated to occur on or about January 2019.

Under Clause 5 extension of the completion are (sic) permissible by mutual agreement in writing.

5.1   Completion.

**Completion is to occur on or about 1 January 2029** with receipt by the Seller of the final instalment ("Final Instalment") of the Purchase Price as set forth in Schedule 1, or at any other time or place agreed in writing by the parties

As discussed, you would like, and I have agreed, to extend this date by two years, to January 2021.  I also confirm that further extensions are permissible.

(emphasis added).  A true and correct copy of Defendant's letter, dated November 6, 2018, is attached as **Exhibit 4.**

77.    Thus, although Walker and Crabtree referenced the Mistaken MIPA Completion Date of 2019 in a conversation, Walker thereafter correctly quoted Section 5.1 of the Corrected MIPAs, confirming the Completion Date is January 1, 2029.

**D.     Blackfyre SA Purchases The Trust's Interest In The 1900 Market MIPA.**

78.     On or about January 6, 2020, pursuant to a Share Sale Agreement, Blackfyre SA purchased Aspen Medical's interest in AMI Ex and the Trust's rights and obligations in the 1900 Market Corrected MIPA.

79.     Indeed, the Share Sale Agreement specifically referenced the 1900 Market Corrected MIPA in Section 6.3, which stated that Blackfyre SA was to deliver to the Trust a letter executed by 1900 Market and AMI Ex, consenting to the assignment and transfer of the 1900 Market Corrected MIPA from the Trust to Blackfyre SA.

80.     Thus, as of January 6, 2020, Blackfyre SA was the successor to the Trust in the 1900 Market Corrected MIPA and assumed all of the Trust's rights and obligations pursuant to that agreement.

81.     Indeed, after execution of the Share Sale Agreement, the Trust has not been an equity owner of AMI Ex.

82.     In addition, after execution of the Share Sale Agreement, 1900 Market's communications regarding the 1900 Market Corrected MIPA have been with Blackfyre SA—not the Trust.

**E.     The Parties Transfer Interest In AMI Ex Mistakenly Believing That The Completion Date Was January 1, 2019.**

83.     Thereafter, on or about August 25, 2020, Walker, mistakenly indicated that the Completion Date was January 1, 2019.

84.     Specifically, Walker wrote to Anodyne stating that he intends to exercise his rights under the Anodyne MIPA.

85.     Walker further stated that he "read the document and there is not much to do but agree that I have triggered as of today and to transfer the money."

13

86.     Walker requested that Anodyne send Walker wire instructions to send the required renumeration pursuant to the agreement.

87.     As a result of this communication, Anodyne transferred to Walker 4.25% of AMI Ex pursuant to their mistaken belief regarding the language in the MIPA.

88.     After executing his rights under the MIPA documents, Walker immediately assigned his 4.25% of AMI Ex to his company Blackfyre SA.

89.     Upon information and belief, this assignment, transfer or sale of 4.25% equity in AMI Ex from Walker to Blackfyre SA was memorialized in an agreement.

90.     Indeed, on February 15, 2021, Walker wrote an email to the principals of Anodyne and 1900 Market admitting that "Glenn's MIPA with 1900 market (sic) was assigned to Blackfyre [SA]".  A true and correct copy of Walker's email, dated February 15, 2021, is attached as **Exhibit 5.**

91.     Upon information and belief, Glenn is a beneficiary of the Trust.  Therefore, Walker was referring to the Share Sale Agreement, dated January 6, 2020, in which Blackfyre SA bought the Trust's rights and obligations in the 1900 Market Corrected MIPA.

92.     Walker also stated in that email that he assigned Blackfyre SA the shares he obtained from Anodyne through the MIPA transaction.

93.     Specifically, Walker wrote, while writing in the third person: "Andrews extant MIPA was finalized (sic) with Anodyne.  I suppose, the way it went was Anodyne to Andrew simultaneous/back to back with Andrew to Blackfyre".  *See* Exhibit 5.

94.     The conduct of all relevant parties constitutes implied consent to Walker's transfer of the 4.25% equity to Blackfyre SA.

95.     Indeed, Walker has never been an owner of AMI Ex in his individual capacity.

96.     In addition, immediately after Anodyne and Walker exercised the MIPA transactions and Walker transferred his interest in AMI Ex to Blackfyre SA, Walker, on behalf of Blackfyre SA, informed the AMI Ex management team to increase Blackfyre SA's equity interest in AMI Ex's books and records by 4.25% to 53.25% and decrease Anodyne's equity interest in AMI Ex's books and records by 4.25% to 21.25%.

97.     The AMI Ex management team changed the equity percentages in AMI Ex's books and records pursuant to Walker's directive.

98.     As a result, from August 25, 2020 until the initiation of this suit, the owners, directors and management of AMI Ex have conducted business with Blackfyre SA as if they consented to the assignment of Walker's transfer of equity to Blackfyre SA.

99.     For example, the owners, directors and management of AMI have acted under the mistaken belief that Blackfyre SA owns 4.25% more equity of AMI Ex from the Anodyne MIPA than it should and Anodyne owns 4.25% less equity in AMI Ex than it should, including but not limited to in connection with paying distributions and voting on company matters.

100.    In addition, because of the equity transfer from the MIPAs, Blackfyre SA became the majority owner of AMI Ex.  In this capacity, Blackfyre SA also took several actions, including but not limited to naming Walker as Chief Executive Officer of AMI Ex and converting preferred shares of AMI Ex that Blackfyre SA owned to a loan.

101.    In addition, Plaintiffs' and AMI Ex management's communications regarding the 4.25% equity transferred pursuant to the Anodyne MIPA has been with Blackfyre SA—not Walker in his individual capacity.

**F.**    **The Mutual Mistake Of Fact That Caused Walker To Exercise His MIPA With Anodyne Had A Knock-On Effect.**

    **1.**    **1900 Market and Blackfyre SA prematurely exercise the 1900 Market Corrected MIPA and Blackfyre SA fails to pay all amounts due under the agreement.**

102.    1900 Market and Anodyne agreed at the time they established AMI Ex that they would always hold the same percentage interest in AMI Ex.

103.    As a result of its agreement with Anodyne and because 1900 Market mistakenly believed Walker properly executed its MIPA with Anodyne, on or about February 18, 2021, 1900 Market and Blackfyre SA also prematurely transferred the 4.2% equity in AMI Ex pursuant to the 1900 Market Corrected MIPA.

104.    Thereafter, on or around February 18, 2021, Walker, on behalf of Blackfyre SA, notified the AMI Ex management team that 1900 Market and Blackfyre SA exercised the 1900 Market Corrected MIPA and, as a result, Blackfyre SA's equity in AMI Ex should be increased by 4.25% to 57.5% and 1900 Market's equity in AMI Ex should be decreased by 4.25% to 21.25%.

105.    The AMI Ex management team immediately changed the equity percentages in AMI Ex's books and records pursuant to Walker's directive.

106.    As a result, the owners, directors and management of AMI Ex have conducted business with Blackfyre SA as if it were the successor to the Trust in the 1900 Market Corrected MIPA.

107.    In particular, the owners, directors and management of AMI Ex have acted under the mistaken belief that Blackfyre SA owns 4.25% more equity of AMI Ex than it should from the transfer in the 1900 Market Corrected MIPA and 1900 Market owns 4.25% less equity in AMI Ex than it should, including but not limited to in connection with paying distributions and voting on company matters.

16

108.    1900 Market, however, recently discovered that Blackfyre SA never paid the amounts necessary pursuant to the 1900 Market Corrected MIPA to transfer the 4.25% equity in AMI Ex.

109.    Pursuant to the Corrected MIPAs, the Purchase Price was to be paid in installments pursuant to Schedule 1.  If the installments as provided on Schedule 1 were not paid, Section 2.2 of the Corrected MIPAs states, the "Agreement shall be null and void and of no future effect."

110.    The Corrected MIPAs also provide that the "Completion Date" was to occur on or about January 1, 2029, which is "the date by which this Agreement is effective and all instalments of the Purchase Price have been received by the Seller".

111.    Thus, not only was the 1900 Market Corrected MIPA prematurely exercised, but Blackfyre SA never paid the final installment pursuant to Schedule 1 of the 1900 Market Corrected MIPA.

112.    As a result, the 1900 Market Corrected MIPA is "null and void and of no future effect."

113.    Thus, as a result of the parties' mutual mistakes of fact, Blackfyre SA owns 8.5% more equity in AMI Ex than it should and Anodyne and 1900 Market each own 4.25% less equity in AMI Ex than they should.

2.    **1900 Market, Anodyne and Blackfyre USA start AMI USA based on the same mistaken ownership percentages of AMI Ex.**

114.    In or about February 2021, 1900 Market, Anodyne and Blackfyre USA decided to create another company called AMI USA.

115.    The parties agreed that the ownership percentages of AMI USA would be the same as those of AMI Ex.

116.    The ownership percentages of AMI Ex, however, were wrong because the parties mistakenly executed the MIPAs prematurely and because Blackfyre SA failed to pay all amounts due under the 1900 Market Corrected MIPA.

117.    As a result, 1900 Market and Anodyne each own 4.25% less of AMI USA than they otherwise should.

118.    The fact that 1900 Market and Anodyne have incorrect ownership percentages of AMI USA has caused 1900 Market and Anodyne damage because it has caused them to receive a reduced amount of profit distributions in AMI USA, which total well in excess of $75,000.

**G.    The Damage Done**

119.    Because 1900 Market and Anodyne prematurely exercised the MIPAs, 1900 Market and Anodyne's respective ownership percentages in AMI USA are 4.25% lower than they should be and Blackfyre USA's ownership percentage is 8.5% higher than it should be.

120.    Up until the initiation of this suit, however, the owners, board of directors and management of AMI USA have acted under the mistaken belief that the MIPAs were validly executed and that Blackfyre USA owns 57.5% and Anodyne and 1900 Market each own 21.25% shares of AMI USA, respectively, including but not limited to in connection with paying distributions and voting on company matters.

121.    As a result, 1900 Market and Anodyne have suffered damages well in excess of $75,000 because the mistaken exercise of the Corrected MIPAs has caused them to receive a reduced amount of profit distributions in AMI USA, among other things.

**H.**  **Plaintiffs Realize The Parties' Mutual Mistake In Exercising The MIPAs Prematurely.**

122.    In or about December 2022, Plaintiffs realized that Blackfyre SA and Walker began to act in their own self-interest regarding AMI Ex rather than in the interest of the company and its owners.

123.    As a result, on February 22, 2023, Anodyne and 1900 Market filed a separate action against Blackfyre SA and Walker seeking Declaratory Judgment, Breach of Fiduciary Duty and Statutory Dissolution of AMI Ex and Appointment of a Liquidating Trustee for AMI Ex.

124.    After filing that action, Anodyne and 1900 Market collected and reviewed agreements and corporate documents relating to AMI Ex, including the Mistaken MIPAs and the Corrected MIPAs.

125.    As a result of that review, Anodyne and 1900 Market realized the mutual mistake of fact between the parties that occurred resulting in the premature execution of the MIPAs, which resulted in the transfer of ownership in AMI Ex and the incorrect ownership percentages of AMI USA.

126.    In addition, 1900 Market realized that Blackfyre SA did not pay the final installment payment as required by the 1900 Market Corrected MIPA.

127.    On April 28, 2023, Anodyne and 1900 Market filed suit against Blackfyre S.A. and Blackfyre USA in Virginia to rescind the transactions relating to the MIPAs based on the parties' mutual mistake of fact.

128.    On September 14, 2023, the U.S. District Court for the Eastern District of Virginia granted defendants' motion to dismiss Blackfyre USA without prejudice from that case on the grounds that Plaintiffs had not sufficiently established personal jurisdiction in Virginia.

129.    Notwithstanding the fact that Blackfyre USA has sufficient contacts with Virginia for a Virginia court to maintain personal jurisdiction, for the avoidance of doubt, Plaintiffs re-filed suit in this Court.

## V.    CLAIMS

### A.    COUNT I: Rescission Based On Mutual Mistake Of Fact

119.    Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

120.    In or about 2017, the parties agreed that Walker would have the opportunity to purchase 4.25% of AMI Ex from Anodyne on January 1, 2029 and that Blackfyre SA (as successor in interest to the Trust) would have the opportunity to purchase 4.25% of AMI Ex from 1900 Market on January 1, 2029.

121.    The purpose of this agreement was to allow AMI Ex time to build its business because it would allow AMI Ex to have 51% ownership by United States citizens, which would permit AMI Ex to bid for and obtain certain United States government contracts.

122.    Despite the parties' agreement, the parties executed the Mistaken MIPAs, which incorrectly indicated that Walker and Blackfyre SA could execute the MIPAs "on or before January 1, 2019".

123.    Walker and Blackfyre SA admitted that the Mistaken MIPAs incorrectly provided for the transactions to occur on or before January 1, 2019 and should have stated that the transactions were to occur on or about January 1, 2029.

124.    As a result, the parties jointly prepared the Corrected MIPAs, which revised the Completion Date to "on or about January 1, 2029" and clarified other sections of the agreement.

125.    Thereafter, Walker and Blackfyre SA admitted that the Completion Date was January 1, 2029 and that the Corrected MIPAs embodied the parties' agreement.

126.    Nevertheless, in 2020, Walker mistakenly notified Anodyne that he was entitled to finalize the purchase of AMI Ex's 4.25% because the "Completion Date" was 2019.

127.    Anodyne believed Walker's mistake of fact and executed the sale.

128.    Walker immediately assigned his interest in AMI Ex to his company Blackfyre SA.

129.    This mistake had a knock-on effect.

130.    On or about February 18, 2021, mistakenly believing that the MIPAs provided for a Completion Date of January 1, 2019 and because 1900 Market and Anodyne had an agreement that they would always own the same amount of AMI Ex, 1900 Market also transferred its 4.25% equity in AMI Ex to Blackfyre SA.

131.    At the time 1900 Market prematurely transferred the 4.25% equity in AMI Ex to Blackfyre SA pursuant to the 1900 Market Corrected MIPA, however, Blackfyre SA did not pay the appropriate Purchase Price pursuant to the agreement.

132.    Nevertheless, the parties mistakenly transferred 1900 Market's 4.25% equity interest in AMI Ex to Blackfyre SA.

133.    In addition, in or about February 2021, 1900 Market, Anodyne and Blackfyre USA created AMI USA based on the same incorrect percentages of AMI Ex.

134.    As a result, Plaintiffs are entitled to rescission of the transactions executed because of the parties' mutual mistakes of fact regarding the MIPA agreements, disgorgement of any amounts Blackfyre USA received as a result of the parties' mutual mistakes of fact relating to the MIPA agreements plus interest, along with attorneys' fees and costs, among other relief.

**B.**     <u>**COUNT II: Declaratory Judgment**</u>

135.     Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

136.     Under the Declaratory Judgment Act, 28, U.S.C.A. § 2201, courts are authorized to declare rights, status and other legal relations to afford litigants relief from uncertainty.

137.     A declaratory judgment is appropriate where the judgment will terminate a controversy or remove an uncertainty.

138.     Here, Defendant refuses to acknowledge that the MIPAs were exercised prematurely, that Blackfyre USA should return 4.25% equity in AMI USA to each of the Plaintiffs and that Blackfyre USA should return the distributions, profits, compensation or any other amounts it received in AMI USA based on the equity it was not entitled to have.

139.     Therefore, the Court's assistance in the form of a judicial declaration setting forth the rights and obligations of the parties is required.

140.     An actual controversy exists between the parties concerning their respective rights, obligations and liabilities.

141.     Thus, Plaintiffs are entitled to declaratory relief to settle the parties' respective rights, obligations and liabilities.

**C.**     <u>**COUNT III: Unjust Enrichment**</u>

142.     Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

143.     Plaintiffs conferred a benefit on Blackfyre USA by virtue of prematurely exercising the MIPAs.

144.     1900 Market also conferred a benefit on Blackfyre USA by virtue of Blackfyre SA failing to make all necessary payments to 1900 Market to receive the 4.25% equity in AMI Ex.

145.     Blackfyre USA knew of the benefit Plaintiffs conferred on it by accepting and retaining the benefit of the 8.5% equity ownership in AMI USA and should have reasonably expected to repay Plaintiffs.

146.     Blackfyre USA accepted and retained the benefit of the 4.25% equity ownership in AMI USA from Plaintiffs without paying Plaintiffs for the value conferred.

147.     As a result, Plaintiffs are entitled to damages in an amount to be determined at trial.

**D.     COUNT IV: Conversion**

148.     Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

149.     Based on the above facts, Blackfyre USA wrongfully exercised or assumed authority over Plaintiffs' 8.5% equity in AMI USA, which deprived Plaintiffs of their possession of such equity.

150.     In addition, Blackfyre USA wrongfully exerted dominion over Plaintiffs' 8.5% equity in AMI USA, which was inconsistent with Plaintiffs' rights.

151.     As a result, Plaintiffs are entitled to damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs respectfully request judgment and relief as follows:

a.     Rescind the transactions, including but not limited to the premature execution of the MIPAs and the ownership percentages attributed to Blackfyre USA, 1900 Market and Anodyne in AMI USA, as a result of the parties' mutual mistake of fact;

b.      Disgorge any distributions, profits, compensation or any amounts Defendant received as a result of the transactions executed as a result of the parties' mutual mistake of fact relating to the MIPA agreements, plus interest;

c.      Declaring that Blackfyre USA must transfer 4.25% equity in AMI USA to Anodyne;

d.      Declaring that Blackfyre USA must transfer 4.25% equity in AMI USA to 1900 Market;

e.      Declaring that Blackfyre USA must repay Plaintiffs the distributions, profits, compensation or other amounts it received as a result of prematurely exercising the MIPAs;

f.      Damages in favor of Plaintiffs in an amount to be determined at trial;

g.      Ordering Defendant to execute any documents effecting the Court's orders; and

h.      Grant such other and further relief as this Court deems just and proper.

Dated:  October 5, 2023

**OF COUNSEL:**

Catherine Pastrikos Kelly
(To be admitted *pro hac vice*)
Meyner and Landis, LLP
100 Park Avenue, 16th Floor
New York, NY 10017
973.602.3423
ckelly@meyner.com

**DLA PIPER LLP (US)**

*/s/ Kelly L. Freund*
Ronald N. Brown, III (I.D. No. 4831)
Kelly L. Freund (I.D. No. 6280)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
(302) 468-5700
ronald.brown@us.dlapiper.com
kelly.freund@us.dlapiper.com

*Attorneys for Plaintiffs*
*1900 Market LLC and AnodyneHS Group LLC*